**In re THINKING MACHINES CORPORATION, Debtor.**

**Bankruptcy No. 94–15405–WCH.**

United States Bankruptcy Court,
D. Massachusetts,
Eastern Division.

Oct. 29, 1996.

Charles R. Dougherty, Hill & Barlow, Boston, MA, for Debtor.

Donald F. Harris, Special Assistant Attorney General, Santa Fe, NM, for New Mexico Taxation and Revenue Department.

### DECISION REGARDING OBJECTION TO PROOF OF CLAIM OF NEW MEXICO TAXATION AND REVENUE DEPARTMENT

WILLIAM C. HILLMAN, Bankruptcy Judge.

### I. Background

The Debtor is a Massachusetts corporation engaged in the manufacture and sale of computers. It sold computer products and services under contracts with Sandia National Laboratories ("Sandia"), the Defense Advanced Research Projects Agency ("DARPA") and the Los Alamos National Laboratory ("LANL") which are all located in New Mexico (collectively the "Buyers"). Between 1988 and 1991, the Debtor billed Sandia, DARPA and LANL a total of $3,014,603 pursuant to these contracts which are referred to as Maintenance Agreements (the "Agreement").

The operative portion of the Agreement provides as follows:

Article 1—Statement of Work and Price

. . .

Furnish full-service on-site maintenance and support in accordance with Attachment I, Maintenance Provisions, dated

September 5, 1989 for the following products at

. . . . .

Attachment I Maintenance Provisions . . .

3. Service Provided . . .

a. Hardware Services

The primary maintenance services provided under this contract will be performed by a Thinking Machines employee (the "Resident Technician") reasonably acceptable to . . ., who shall, for a minimum of 195 business days per year, be present onsite during . . . normal business hours. . . .

Description . . .

Full-service maintenance and support for CM2–16–FS Connection Machine system, product code CM–MA–16–FS which includes: Connection Machine (not front end) spare parts; One person, single shift, on-site Applications Engineer to provide software and hardware support with immediate response (within 1 hour) to maintenance problem requests;

Applications consultation and limited, on-going customer training and education provided by the Applications Engineer; Priority will be given on all software and filed hardware upgrades and FCO's implementation typically within one week from date of release); When the resident Applications Engineer is not available, the home office will respond immediately to problem requests and, if necessary, be on-site within 24 hours or at a time agreed upon with customer . . .

Full service maintenance and support for Gbyte Data Vault mass storage system, product code CM–MA–DV10B . . .

Full service maintenance and support for VME/IO Interface with CM I/O channel, product code CM–MA–VME1.

In May of 1992, the New Mexico Taxation and Revenue Department (the "Department") commenced an audit of the Debtor for the period from January 1, 1988 through March 31, 1992. Based upon the above-quoted language and the invoices which referred to services rendered, the auditor concluded that the Agreement constituted the sale of a service and assessed the Debtor for tax, penalty and interest on a tax base of $3,259,291.

The Debtor protested the assessment. The Debtor asserted that the tax base was $405,000 because this was the only amount of revenue attributable to the services rendered under the Agreement. The remaining amounts which the Debtor charged the Buyers under the Agreement were for the sale of tangible personal property.

The Department disputed the Debtor's characterization of the Agreement and asked the Debtor to produce documentation to support its contention that the Agreement principally involved the sale of tangible personal property and hence was exempted by tax certificates issued by the Department as discussed below.

On August 17, 1994, the Debtor filed for relief under Chapter 11 of the United States Bankruptcy Code. On September 21, 1994, the Department filed a proof of claim for the amount of the assessment. The Debtor objected to the claim on the grounds that the Debtor held certificates that exempted the Debtor from payment of New Mexico's state gross receipts taxes for "the value of transactions involving the sale of tangible personal property . . ." and that the Department had failed to state the basis of its claim.

II. Analysis

a. The Burden of Proof

A proof of claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). It constitutes prima facie evidence of the validity and amount of the claim. Fed. R.Bankr.P. 3001(f).

Courts routinely hold that if a party objecting to a proof of claim meets or overcomes the presumption of Rule 3001(f), the ultimate burden rests upon the claimant to establish the claim by a preponderance of the evidence. *In re Premo,* 116 B.R. 515, 518 (Bankr.E.D.Mich.1990). This is intended to place the claimant in the same position it would have been had the claimant been a plaintiff in a civil action.

The application of this rule is problematic when the claimant is a taxing authority. Un-

like an ordinary plaintiff in a civil action, the burden of proof in a contest involving a tax assessment rests with the taxpayer. *United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976); *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 290–91, 79 L.Ed. 623 (1935); *United States v. Rexach,* 482 F.2d 10, 17 (1st Cir.1973), *cert. denied* 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973). This rule is supported by "the presumption of administrative regularity; the likelihood that the taxpayer will have access to the relevant information; and the desirability of bolstering the record-keeping requirements of the Code." *Rexach,* 482 F.2d at 16. *Psaty v. United States,* 442 F.2d 1154, 1160 (3rd Cir.1971). In *Rexach,* Judge Coffin further stated that if the burden were placed on the government in an action to collect assessed taxes it "would encourage taxpayer delay and inaction thereby imposing on the government the costs and burden both of borrowing money to meet the gap of unpaid taxes and of initiating litigation. It would also undermine the record keeping requirements thereby making the government's case more difficult if not impossible to establish." 482 F.2d at 17.

In the bankruptcy claim context, however, a majority of courts place the burden of proof on taxing authorities. *Franchise Tax Board, of California. v. MacFarlane (In re MacFarlane),* 83 F.3d 1041 (9th Cir.1996); *Placid Oil Co. v. I.R.S. (In re Placid Oil Co.),* 988 F.2d 554 (5th Cir.1993); *California State Board of Equalization v. Official Unsecured Creditors Committee (In re Fidelity Holding Co., Ltd.),* 837 F.2d 696 (5th Cir.1988); *Gran v. I.R.S. (In re Gran),* 964 F.2d 822 (8th Cir. 1992); *In re Premo, supra;* and *In re Dakota Industries, Inc.,* 131 B.R. 437 (Bankr. D.S.D.1991).

In contrast, other courts hold that the burden of proof in bankruptcy cases remains on the taxpayer. *United States v. Charlton,* 2 F.3d 237 (7th Cir.1993); *Internal Revenue Service v. Levy (In re Landbank Equity Corp.),* 973 F.2d 265 (4th Cir.1992); *Resyn*

*Corp. v. United States,* 851 F.2d 660 (3rd Cir.1988) and *Cobb v. United States (In re Cobb),* 135 B.R. 640 (Bankr.D.Neb.1992).

I find the cases adopting the majority rule unpersuasive. *Gran* and *Placid Oil* relied solely on *Fidelity* for their holdings. *Fidelity* relied, in turn, on a case from this district and one from New York for the proposition that the government and litigants should be subject to the same burden of proof. *In re WHET, Inc.,* 33 B.R. 424, 437 (Bankr. D.Mass.1983) and *In re Avien, Inc.,* 390 F.Supp. 1335 (E.D.N.Y.1975), *aff'd,* 532 F.2d 273 (2d Cir.1976).

In *WHET,* Judge Lavien addressed whether the procedure implemented by the court for addressing claims objections was proper. While he did state that the burden of proof is always on the claimant, the issue was neither discussed nor was it a necessary part of the decision. Significantly, he ruled otherwise in a later proceeding. *See In re Mason,* 118 B.R. 170 (Bankr.D.Mass.1990) (assumed without discussion burden is on debtor in action under 26 U.S.C. § 6672).[1] Similarly, *Avien* relied on an oft cited case, *In re Gorgeous Blouse Co.,* 106 F.Supp. 465 (S.D.N.Y.1952). I agree with Judge Spector's conclusion in *Premo* that *Gorgeous Blouse* "offers no rationale to justify its holding." *Premo,* 116 B.R. at 524.

In *MacFarlane,* the Ninth Circuit found the logic of *Fidelity* compelling. 83 F.3d at 1041. It held that it would be inequitable to provide a taxing authority with both a priority claim and relief from the burden of proof rules applied to other claimants. *In re Dakota Industries* concluded that the plain language of § 502(a) and Rule 3001(f) requires the court to place the ultimate burden on the claimant.

*In re Premo* offers a detailed discussion of the issue and stated that it found the case law unpersuasive. Judge Spector applied the factors to which the First Circuit referred in *Rexach* when discussing the reasons for the general rule in tax litigation, 116 B.R. at 522,

---

1. In the only other applicable decision from this district, Judge Goodman declined to follow *Mason,* adopted the holding of *Premo* without further discussion and held that the burden is on the taxing authority in an action arising under 26

U.S.C. § 6672. *In re Bourque,* 153 B.R. 87, 91–92 (Bankr.D.Mass.1993). Because neither *Bourque* nor *Mason* discusses the issue in any detail, I do not find them helpful in reaching a conclusion.

but held that these considerations did not warrant placing the burden on the debtor in bankruptcy. In ruling that the burden should be placed on the taxing authority, he held that "a few cases have made valid arguments as to why tax claims should not be treated differently from other kinds of claims against the debtor." 116 B.R. at 524. Moreover, he stated that placing the burden on the taxing authority would be "justifiable in part as a means of promoting uniformity, if only within the Sixth Circuit." *Id.*

I do not find the *Fidelity* line of cases persuasive. They relied on cases which did not discuss the issue or offer grounds for their conclusions. *Dakota Industries* rested on statutory language which does not exist. While *Premo* did offer a thorough discussion of the issues involved, in the end it relied upon a few cases which made "valid arguments" and the need to have uniformity within the Sixth Circuit as grounds to place the burden on the taxing authority.

Lastly, although *MacFarlane* relied in part on *Fidelity,* it also relied on the equities as between the creditors. This was unnecessary to decide the case. I find that the Bankruptcy Code's priority scheme is not relevant to the issue of how the burden of proof is allocated between a taxing authority and debtor. If it were relevant, the argument favors the taxing authority because the priority status afforded the taxing authority supports preservation of the allocation of burdens between the parties in bankruptcy.

Of the cases which place the burden of proof on the taxpayer, *Charlton* and *Resyn* are not helpful because they assume without discussion that the burden is on the debtor in a claim based upon 26 U.S.C. § 6672.

In *Landbank,* the Fourth Circuit first emphasized that Rule 3001(f) only provides for the efficient resolution of an undisputed claim and nothing more. 973 F.2d at 269. The Fourth Circuit then concluded that the Bankruptcy Code was only designed to supplant substantive law except in particular inapplicable instances. 973 F.2d at 270. Accordingly, it held that, "upon review of the code and its legislative history, we find nothing which suggests that this dispute between a taxpayer and the IRS should be decided in a manner any different from that in which the case would be determined outside the bankruptcy context." 973 F.2d at 271.

In *Cobb,* Judge Minehan provided a useful summary of the operation of rule 3001(f):

... I respectfully disagree with this growing weight of authority and conclude that the burden of proof with respect to tax claims is not shifted as a result of Bankruptcy Rule 3001(f).

Bankruptcy Rule 3001(f) does not, in a technical sense, allocate burdens of proof. The Rule simply establishes that a proof of claim constitutes evidence ... The Rule, in effect, creates a presumption which must be overcome by debtor. Once the presumption of the Bankruptcy Rule 3001(f) is overcome, the proof of claim no longer constitutes evidence—the bubble is burst. The burden of proof is to then be allocated by applicable non-bankruptcy law.... In the case of tax claims, the burden of proof and persuasion is upon the taxpayer.... Bankruptcy Rule 3001(f) does not shift the burden to the IRS.

To rule otherwise would permit a tax litigant to shift the burden of proof to the Internal Revenue Service by filing bankruptcy.

*Cobb v. United States (In re Cobb),* 135 B.R. 640 (Bankr.D.Neb.1992). *See also Abel v. United States,* 200 B.R. 816 (E.D.Pa.1996); *In re Ford,* 194 B.R. 583 (S.D.Ohio 1995).

I find *Landbank* and *Cobb* to be soundly reasoned and persuasive. Section 502(a) and Rule 3001(f) create only a presumption which will vanish if the debtor produces evidence to meet or overcome the presumption. Thereafter, the burden of proof is allocated by non-bankruptcy law. There is nothing in the Bankruptcy Code or Rules to suggest that Congress intended to supplant the well-established rule that the burden of proof rests on the taxpayer in a contest involving a tax assessment. Further, this conclusion is consistent with the goal of placing the claimant in the same position it would have been absent the bankruptcy. Accordingly, I hold that the Debtor bears the ultimate burden of proving that the assessment is incorrect by a

preponderance of the evidence. *In re Ford,* 194 B.R. at 589.

### b. The Standard for the Assessment

The Debtor contends that the assessment is incorrect because a great majority of the sums derived under the Agreement are from the sale of tangible personal property and are therefore not property included in the tax base.

N.M.Stat.Ann. § 7–9–4(A) provides in relevant part that "[f]or the privilege of engaging in business, an excise tax equal to five percent of gross receipts is imposed on any person engaging in business in New Mexico (the "Gross Receipts Tax")." Gross receipts "means the total amount of money or the value of other consideration received from selling property in New Mexico, from leasing property employed in New Mexico, from selling services performed outside New Mexico the product of which is initially used in New Mexico or from performing services in New Mexico." N.M.Stat.Ann. § 7–9–3(F). Further, "it is presumed that all receipts of a person engaging in business are subject to the gross receipts tax." N.M.Stat.Ann. § 7–9–5.

The parties agree that to the extent that what was provided under the Agreement was the sale of personal tangible property, the Debtor is exempt from taxation as a result of certain nontaxable transaction certificates. To the extent, however, what was provided under the Agreement constituted services rendered, the Debtor has a gross receipts tax liability.

The parties also agree that in order to determine whether there was a sale of a service or tangible personal property under the laws of New Mexico, I must apply the "predominant ingredient test" as set forth in *EG & G, Inc. v. Director, Revenue Division Taxation and Revenue,* 94 N.M. 143, 607 P.2d 1161 (N.M.Ct.App.1979). Therefore, in order to prove that the assessment was incorrect, the Debtor must prove by a preponderance of evidence that the majority of the input or cost of the Agreement was tangible personal property and not service.

### c. What the Debtor Provided the Buyers Under the Agreement

■ The Agreement provides that the Debtor will furnish both maintenance and replacement parts, the latter only when the Debtor deems them necessary. The Debtor urges me to view the Agreement in terms of its three components: (1) replacement hardware; (2) software licensing and support; and (3) applications engineering services. The only category, it asserts, which involves a taxable service is the applications engineering services. The Debtor contends that because the services provided by the engineers are a minor portion of the Agreement, I must find that the predominant ingredient of the Agreement is the sale of the tangible personal property and therefore not subject to taxation.

### 1. The Replacement Hardware

The Debtor submits in its post-trial brief that:

> it is beyond dispute that property i.e., very expensive computer parts, overwhelmingly constitutes the predominant part of the sale. The Maintenance Agreements are part and parcel of TMC's sale of a multimillion dollar, supercomputer system to its customers. Indeed, there has never been an instance where TMC has not entered into a Maintenance Agreement upon the sale of one of its computer systems ... The main thrust of the Maintenance Agreements and hence the driving force behind its high monthly cost, is the provision of hardware support.

Debtor's Brief at p. 8.

Specifically, the Debtor argues that the hardware replacement comprises 80 to 90 percent of the costs of what was supplied to the Buyers under the Agreement. According to the Debtor, the reason for this high percentage is that the Buyers required replacement parts on almost a daily basis and that these parts were expensive. To support this contention, the Debtor relies upon the testimony of Robert LaBossiere, Vice President of Finance and Administration for the Debtor.

Mr. LaBossiere first testified that the allocation of costs between services and materials out-of-state was 80/20 or 90/10. The basis for his assertion was that these were the Debtor's historic allocations and allocations within the industry. Later, Mr. LaBossiere stated that he believed that the 80/20 or 90/10 allocation was appropriate generally under the Agreement. When asked during this portion of his testimony how he arrived at that percentage, Mr. LaBossiere also stated that "in terms of cost, again ... In terms of the hardware, it's important to note that the amount of inventory, the amount of carrying costs, and the amount of material required for the repair loop to actually physically repair those boards." Tr. at p. 119.

In addition to Mr. LaBossiere's testimony, the Debtor offered evidence of its pricing under the Agreement to further support its contention that the costs for the hardware constituted 80 to 90 percent of its total costs under the Agreement. First, the Debtor referred to Exhibit 13, the Debtor's analysis of the auditor's taxable service revenue for 1988 through 1991. The Debtor offered this exhibit to show the prices for the three categories of items it provided under the Agreement by customer site for the years covered by the audit. Tr. at p. 75.

> In its Brief, the Debtor contends that
> [t]he testimony and exhibits at trial established that the pricing of the Maintenance Agreements, which included different monthly costs for different machines in the system, was driven by the costs of the replacement parts ... This is not surprising, given that the computers sold by TMC are highly complex, multi-million dollar computer systems ... Each board switch, drive etc. that needs to be replaced is very expensive, regardless whether the replacement part is brand new or fully reconditioned. As a result, the pricing under the Maintenance Agreement largely derives from the size and complexity of the system sold to the customer in anticipation of the number and types of replacement components which will likely be required.

Debtor's Brief at p. 9.

To evidence the rate of replacement, the Debtor submitted the log of replacement parts provided to the Buyers during the audit period. Mr. LaBossiere, however, stated that this log did not play a role in his determining the allocation rate. Tr. at p. 119.

Lastly, the Debtor offered a purchase order dated April 3, 1989 to establish how it priced replacement hardware furnished under the Agreement (the "Purchase Order"). On page 3 there was an equipment list. Item No. CM2–64V–E, the Debtor explained, provided for "a combination of the applications engineer and the hardware support for the connection machine product." Tr. at p. 73.

The specific language for that entry is as follows:

> One-person-one-shift on-site support to provide hardware and software support of CM2064V–E connection Machine system. Includes Connection Machine (not front end) spare parts. Software maintenance and software upgrades for Connection Machine system software are included in the service package. This option does not include maintenance contract for front end. Includes immediate response ... to problem with diagnoses and subsequent repair. Support will also include limited, ongoing customer training and education, as well as applications consultation for design and implementations of applications....

The Department contends that, based upon the evidence described above, the Debtor has not met its burden to show that replacement parts were 80–90% of what was provided under the cost of the Agreement. I agree.

The Debtor first asks me to conclude that 80–90% of the cost of the Agreement can be allocated to hardware because it is standard in the industry. I cannot accept such an assertion without evidence of what is standard in the "industry", however that term may be defined. Mr. LaBossiere was not qualified to give evidence on this issue. *See* Fed.R.Evid. 701 and 702. Moreover, the Debtor is incorrect when it states that Mr. LaBossiere. testified that such an allocation was proper based upon the costs under the Agreement. Mr. LaBossiere only testified, in response to a question regarding how he

arrived at the allocation, that "it's important to note the amount of inventory, amount of carrying cost and amount of material." Significantly, he did not testify that he calculated the actual costs for those items and determined that they constituted 90% of the Debtor's costs under the Agreement. Furthermore, he never offered any documentation that would have substantiated such a conclusion.

In addition, the Debtor relied on how it priced items provided under the Agreement to establish its costs under the Agreement. This evidence was unpersuasive. First, the language of the Agreement and the Purchase Order clarifying what Debtor was going to provide to the Buyers, principally described services to be rendered.[2] Accordingly, these documents do not support the conclusion that the pricing for the Agreements was based upon the cost of the hardware. The Debtor failed to demonstrate its costs of hardware.

The Debtor also relied upon the replacement part log to establish its costs. This log contained a list of replacement parts for two customers during a portion of the audit period. It also contained an estimated selling price for the parts if they were sold at fair market value which they never were. Assuming that the log is an accurate representation of the parts provided over the period of the audit, it still fails to indicate the cost of these parts to the Debtor. Mr. LaBossiere testified that "[e]ach board, switch, drive, etc. that needs to be replaced is very expensive, regardless whether the replacement part is new or fully reconditioned." Tr. at p. 9. He further stated that he did not know the average material costs or the rate at which replacement parts were needed.

Lastly, the Debtor relied on Exhibit 13 to establish the total of the prices charged to the Buyers during the audit period. Again, evidence of the price is insufficient to establish the cost.

Based upon these and other similar deficiencies, I cannot conclude that the Debtor

has established, by a preponderance of the evidence, that the hardware replacement category constituted 80–90 percent of the cost of items furnished under the Agreement or even that the hardware costs were a predominant portion of the Agreement.

### 2. The Software Licensing

The parties agree that this category involved the sale of a license. The parties disagree, however, as to how the sale of the software under the Agreement is to be characterized under New Mexico tax law. The Debtor argues that such a sale is tax exempt under N.M.Stat.Ann. § 7–9–3(I) and GR 3(I):5.[3]

N.M.Stat.Ann. § 7–9–3(I) provides that " 'property' means real property, tangible personal property, licenses, franchises, patents, trademarks and copyrights."

GR 3(I):5 provides the following [4]:

The definition of property includes licenses. The sale of a license to use software constitutes a sale of property and comes within the definition of gross receipts.

The transaction constitutes a sale of a license to use the software program when a computer software company sells an already-developed software program where:

1) no extraordinary services are performed in order to furnish the program,

2) the buyer pays a fixed amount for the license to use the program and use is generally limited to a specific computer, and

3) the buyer may not resell to any other person a license to use the program and may not transfer the software package itself to any other person.

An additional applicable regulation, GR 3(F):65, provides in relevant part:

When a computer company sells a prepackaged software program where:

1) no extraordinary services are performed in order to furnish the program;

---

2. I am referring to Exhibits 3 and 11 respectively.

3. GR denotes the regulation issued under the Gross Receipts and Compensating Tax Act.

4. This regulation became effective on September 17, 1991 subsequent to when the bulk of the software receipts were generated.

2) the buyer pays a fixed amount for the software package and the license to use the software; and

3) the buyer is allowed to resell the license to use the program with the software package itself;

such a transaction constitutes a sale of tangible personal property ... This version of this regulation is retroactively effective July 1, 1991.

The Debtor asserts that the licenses were for operational software languages and therefore did not consist of extraordinary services. In support of this contention, the Debtor cited to the protest letter it wrote after the assessment. The Debtor further contends that the Department lacks an understanding of the industry and that there was no extensive tailoring of the software to meet the customers needs.

In contrast, the Department argues that the sale was the sale of an intangible and therefore not included within the regulations. Specifically, the Department asserts that the services involved in the installment of the Debtors's software constituted "extraordinary services".

The Debtor did not present evidence sufficient to satisfy its burden on this issue and I find as a matter of fact that it has failed to meet its burden of proof. The Department, however, has stipulated that "If the [C]ourt adopts the analysis on either Exhibits C or D to this brief, the Department will agree to forgo the slight addition to the tax base which would arise by taxing all of the software, while only taxing most of other maintenance charges under the allocation of in-state services to out-of-state services." Debtor's Brief at p. 26. Because I have adopted one of the suggested models, the issue with respect to this category is moot.

### 3. Services Rendered

The Debtor charged the Buyers $5,000 per month for engineering services under the Agreement.[5] To justify this amount, the

Debtor asserts that the engineers play a minor role because they primarily provide software consultation to assist the Debtor's customers in converting their applications to the Debtor's environment. The hardware servicing is but a very minor aspect of the engineer's job. According to the Debtor, the $5,000 allocation was to cover 75% of the engineer's time which the Mr. LaBossiere testified was "sort of an industry standard" Tr. at p. 74. Accordingly, the Debtor contends that it is only this portion of the Agreement which is subject to taxation under N.M.Stat.Ann. § 7–9–4(A).

The Department contends that the $5,000 "charge" is not an accurate estimate of the value of the services performed in New Mexico because that sum was significantly less than the payroll cost for the engineers.

This is the issue that initially triggered the audit. The Department decided that since the reported revenue for the engineers did not correspond to the costs allocated by the Debtor, the revenue under the Agreement allocated to the sale of tangible personal property was inflated.

The auditor who performed the audit of the Debtor testified about the cost of the New Mexico payroll to the Debtor. The Debtor provided the auditor with a database run of the Debtor's New Mexico payroll which reflected the gross wages. To that sum, the auditor added 30% to reflect the additional costs of employment taxes, insurance and other employee benefits in order to arrive at an estimated cost of the payroll to the Debtor. He thereafter prepared schedules which reflected the cost of the payroll with just engineers and one with all New Mexico employees. Neither of the models included the cost for out-of-state wages attributable to the in-state service cost. These models establish that the Debtor's actual payroll costs far exceeded the revenue allocated to engineers under the Agreement.

The Debtor contends that to obtain the cost of the payroll, the auditor should have

---

5. Significantly, the invoices do not reflect this charge. Instead, the Debtor cites to a 1989 price list to support its position that a customer may decline the service and receive a $5,000 credit.

This evidence is given little weight because the price list refers to computers which were not used during the audit period.

added only 20% to the gross wages because 20% is the historic and industry standard.

I find the Department's analysis of the Debtor's payroll persuasive. With respect to the payroll markup, the auditor, a certified public accountant who has performed over twenty audits of comparable companies, testified that 30% is an average markup. Given that the Debtor failed to proffer expert testimony on this issue, I give little weight to the explanation that 20% is the industry standard. Having concluded this, I further conclude that the Debtor has not established a reasonable basis for its allocation for the applications engineer. As such, I cannot conclude that the costs to the Debtor for such engineers were a minor part of the Agreement.

The Debtor has not shown by a preponderance of the evidence that the predominant ingredient of the Agreement was the sale of tangible personal property. Accordingly, the proceeds from the Agreement are taxable as a service.

### d. Services Rendered In–State and Services Rendered Out-of-State

Finally, the Debtor also argues to the extent that I find that the Agreement constituted a service, I must separate the services rendered in New Mexico from those rendered in Massachusetts. The Debtor contends that with the exception of the services provided by the engineers in New Mexico, all of the services provided by the Debtor under the Agreement occurred within Massachusetts. The Debtor asserts that the services rendered in Massachusetts cannot be taxed pursuant to N.M.Stat.Ann. § 7–9–13.1 and GR 3(F):33.[6]

The Department agrees that revenues derived from out-of-state services are exempt but contends that the Debtor has failed to provided sufficient information to make a determination of where services under the Agreement were performed. The Department further argues that what can be taxed are the overhead and administrative expenses included in the cost of performing services in New Mexico. *See* GR 3(F):65 [7]. *See also United States v. New Mexico*, 581 F.2d 803 (10th Cir.1978), *aff'd on other grounds*, 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1979).

To establish what these costs are, the Department created models. With respect to this analysis, the Department attributes 50% of the out-of-state service costs to materials and 50% to services due to the lack of information. In arriving at this allocation, the Department used a 1995 forecasted income statement from the Debtor's Disclosure Statement. The Department also prepared the same analysis excluding software services.

The Debtor disputes this analysis for several reasons. First, it complains that the 50–50 split between materials and service was arbitrary and that within the industry the split would provide 10–20% for service. Further, the Debtor contends that the mark up factors should have been based upon the Debtor's historical figures instead of the 1995 forecasted income statement which would

---

6. N.M.Stat.Ann. § 7–9–13.1 provides that "exempted from gross receipts tax are the receipts from selling services performed outside New Mexico the product of which is initially used in New Mexico ... exemption ... does not apply to research and development services." GR 3(F):33 provides that "[r]eceipts from performing services, except research and development services, outside New Mexico are not subject to gross receipts tax ..."

7. GR 3(F):65 provides as follows:

General administrative and overhead expenses incurred outside New Mexico and allocated to operations in this state for bookkeeping purposes, costs of travel outside new Mexico which travel was an incidental expense of performing services in New Mexico, employee benefits, such as retirement, hospitalization insurance, life insurance and the like, paid to insurers or others doing business outside New Mexico for employees working in New Mexico, and other expenses incurred outside New Mexico which are incidental to performing services in New Mexico, all constitute the taxpayer's expenses of performing services in New Mexico.

No provision of the Gross Receipts and Compensation Tax Act allows a deduction for expenses incurred in performing services to determine gross receipts subject to tax. Therefore, the total amount of money or reasonable value of other consideration derived from performing services in New Mexico is subject to the gross receipts tax.

have resulted in lower numbers. In addition, the Debtor asserts that the Department incorrectly used a payroll burden of 30% which is typical for engineering firms instead of 20% which "typically or historically for Thinking Machines, that number has been about twenty percent." Tr. at p. 77. Finally, according to the Debtor, the Department should have only included 75% of the payroll for the engineers.

I conclude that the 50–50 split is appropriate. With respect to the use of the forecasted income statement, the Department offered a persuasive reason why it was used; it provided the necessary breakdown.[8] I further conclude that the markup for the payroll is proper and that the 75% charge for the engineers is not justified.

Nevertheless, the Department has provided a model to establish a tax base taking into consideration the Debtor's exhibit regarding service margins and provides a 15% allocation for costs for out-of-state services. Department's Brief, Exhibit D. I regard that adopting such a model is a fair resolution of the controversy presented in this section.

III. Conclusion

■ I find as a matter of fact that the Debtor has failed to sustain its burden of showing that the calculations used by .the Department are incorrect. Under the law of New Mexico, an assessment is presumed to be correct. *Siemens Energy & Automation, Inc., v. New Mexico Taxation & Revenue Dept.*, 119 N.M. 316, 889 P.2d 1238 (N.M.Ct. App.). Further, the models created by the Department are presumed to be correct. Regulation TA 17:4.

To establish the exact amount of its claim, the Department requested that I adopt one of the models prepared by their auditor. As I concluded above, I will adopt the model presented in Exhibit D of the Department's brief. The Department may make the additional calculations with respect to any interest or penalties. To the extent that there is

a dispute as to those amounts, the parties may. request a further hearing from this Court. A separate order will enter.

---

8. During testimony on this issue, the Debtor entered into evidence a document entitled "1988–'92 Service Margins." It was offered to show the Debtor's "actual performance in terms of service revenues against costs for the audit period." I cannot accord this document great weight. I do not know who prepared the document, I do not know its purpose and I do not know upon what documents it is based.