**In re ST. JOHNSBURY TRUCKING COMPANY, INC., Debtor.**

**Bankruptcy No. 93–B–43136 (FGC).**

United States Bankruptcy Court,
S.D. New York.

March 7, 1997.

K.M. Lewis, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.C., New York City, for St. Johnsbury Trucking Co. Inc. (Debtor).

T.J. Nicholas, Office of the Attorney General of Massachusetts, Boston, MA, for Mitchell Adams, Commissioner, Massachusetts Department of Revenue (Massachusetts).

## Memorandum of Decision on Motion to Reconsider Disallowance of Claim

FRANCIS G. CONRAD, Bankruptcy Judge.

In the motion to reconsider before us[1], Massachusetts asks us to reconsider our Or-

---

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C.A. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C.A. § 157(b)(2)(A) and (B). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable to this proceeding by Fed.R.Bkrtcy.R. 7052.

der disallowing and expunging the tax deficiency claims of Massachusetts against Debtor. Massachusetts had filed a proof of claim to which Debtor objected by asserting that its records showed no taxes due. Massachusetts was unable to locate the documents which supported its claim and could not produce them at the claims objection hearing. We disallowed the claim, but invited Massachusetts to move for reconsideration if it found the documents. Massachusetts finally located papers supporting its deficiency claim. Accordingly, we grant Massachusetts' Motion to reconsider, and now consider the claim on its merits. The documents submitted by Massachusetts, in combination with Debtor's exhibits in opposition compel us to allow Massachusetts' deficiency claim, virtually in its entirety.

## FACTS

Before Debtor's June 1993 filing of its Chapter 11 petition, Debtor was a leading regional carrier of general commodity freight. In 1986, Sun Company, Inc., acting through one of its subsidiaries, acquired Debtor. Sun Company, Inc. then sold Debtor, together with Jones Truck Lines, Inc. and Milne Truck Lines, Inc., to Sun Carriers for approximately $212 million. Approximately half of the funding for this leveraged acquisition came from Bankers Trust Company of New York under a credit agreement between Sun Carriers, Debtor, Jones Truck Lines, Milne Truck Lines and Bankers Trust. *See* Debtor's Objection to Motion of the Massachusetts Department of Revenue for Reconsideration, pp. 8–10 (hereinafter "Debtor's Objection").

The documents pertaining to the leveraged acquisition, according to Debtor, take up six bound volumes. Debtor's Objection, page 9. We did not receive all of the documents. Instead, Debtor submitted pieces, many unsigned, of the various credit and pledge agreements that evidence some of Debtor's obligations under the acquisition. For purposes of this Memorandum of Decision, we assume the unsigned documents to be binding. For example, Debtor was prohibited from incurring debt over certain amounts (other than Sun Carriers' debt) and from paying distributions to anyone other than Sun Carriers. Exhibit 7, Pledge Agreement, page 4 of exhibit A. Also, Debtor could not sell assets that contributed to more than 15% of Debtor's revenues unless it (a) applied the entire net proceeds to the outstanding bank debt, (b) reinvested the entire net proceeds in the trucking business or (c) used the entire net proceeds to purchase certain notes that Sun Carriers offered as part of the acquisition. Exhibit 7, Pledge Agreement, page 7 of exhibit A. All of Debtor's assets were pledged to secure the acquisition debt; Sun Carriers had few assets of its own. Debtor's Objection, page 9, citing Exhibit 9, 1989 Tax Return, page 10. Debtor also guaranteed the acquisition debt. Exhibit 8, Amended and Restated Credit Agreement, exhibit VII.

Exclusive of the agreement with Bankers Trust, Debtor also entered into an agreement with Sun Carriers and each of Sun Carriers' subsidiaries in September of 1986. See Exhibit 11, Agreement. Under this agreement, each of Sun Carriers' subsidiaries were to pay Sun Carriers a "management fee." Part of the management fee, entitled "consideration" for management services, was calculated by multiplying Sun Carriers' total operating expenses, exclusive of debt service, by a percentage of the revenue of all of the subsidiaries that each subsidiary represented. Exhibit 11, page 3. The second part of the management fee, entitled "debt allocation," was calculated by multiplying Sun Carriers' interest expense, incurred in connection with either the acquisition or operation of the subsidiaries, by each subsidiary's proportionate share of all of the subsidiaries' shareholders' equity. Exhibit 11, pp. 4–5.

In the fiscal years ending March 1988 and March 1989, Debtor and Sun Carriers treated the management fee, for tax purposes, as a lump sum; their returns did not divide the fee into its separate components as described above. The entire management fee was labeled an expense which represented "general and administrative expenses incurred by Sun Carriers on behalf of the [Debtor]." Exhibit 23, Consolidated Financial Statements, page 8. Sun Carriers treated the management fee, essentially a reimbursement of expenses,

as a reduction of its overall expense deduction, or a negative "allocated expense." Exhibit 26, Portions of 1989 Consolidated Tax Return, page 42.

Massachusetts, as a result of its 1993 audit of Debtor, separated for tax purposes the two components of the management fee. It disallowed as an expense the "debt allocation" component of the management fee because the interest expense was really that of Sun Carriers. *See* Exhibit 4, Audit Narrative, pp. 3–4. Massachusetts' research indicated that interest expense can not be pushed down to a subsidiary where that subsidiary would in effect be paying for someone to acquire it. *Id.* Massachusetts then reclassified Debtor's claimed interest expense as a dividend paid to its parent, Sun Carriers. This, in turn, increased Debtor's taxable income.[2] *Id.* We address Massachusetts' treatment of the "consideration" for services component of the management fee separately below.

On October 8, 1988 (fye 3/89), Sun Carriers moved from Pennsylvania to Holliston, Mass., Debtor's headquarters. The extent of Sun Carriers' continued operations after the move is disputed and is not ascertainable from the papers before us. It is undisputed, however, that the management fee ceased after this date and was not reinstated until the fiscal year ending March 1991. *See* Debtor's Objection, page 23. Debtor has given at least two reasons for the suspension of payments to Sun Carriers. We discovered a potential third.[3] On its 1989 Consolidated Financial Statement, Debtor explained that after the move, Sun Carriers "consolidated its corporate activities with the offices of the [Debtor], substantially reducing expenses. The remaining expenses will now be incurred directly by the [Debtor]." Exhibit 23, Consolidated Financial Statements, page 8. On the other hand, in its objection before us Debtor explains:

> It is understandable that, due to the confusion of the move, the financials failed to reflect the reimbursements for the latter part of fiscal year 1989. However, this oversight was corrected in the financial statement for 1991 consistent with the terms of the Management Agreement and the fact that the cost of performance by Sun Carriers continued after its move to Pennsylvania. [citations omitted].

Debtor's Objection, page 23. Massachusetts, more in tune with Debtor's first explanation, determined from inquiries it made during the audit process that the fee ceased because management services were no longer being provided by Sun Carriers after the move. Exhibit 4, Audit Narrative, page 2, ¶ 3.

Having spent nearly half of the fiscal year ending March 1989 in Massachusetts, Sun Carriers proceeded to file a Massachusetts Corporate Tax Return. Although Sun Carriers originally mistakenly attributed 100% of its 1989 income to Massachusetts, its amended return gave an apportionment percentage of 33.82%. Exhibit 14, Audit Log, page 59. The apportionment percentage, in its fractional form, represents a property factor multiplied by a payroll factor multiplied by twice a sales factor, the result of which is divided by four. Mass.G.L. Ch. 63 § 38(c). Each factor represents a fraction that compares the portion of the factor attributable to Massachusetts to the entire factor (i.e. Massachusetts sales divided by sales everywhere = sales factor). Mass.G.L. Ch. 63 § 38(d), (e) & (f). According to its audit, Massachu-

---

**2.** Massachusetts is not concerned with fiscal year ending March 1990 because Debtor paid Sun Carriers a dividend representing the interest expense in that year.

**3.** Amongst the unsigned documents representing one of the Amended and Restated Credit Agreements, is a principal repayment schedule for the "Subsidiary Borrowers" on a "Subsidiary Real Estate Loan" from Bankers Trust to Debtor, Milne and Jones. The total principal due and the final installment date match a $50 million "Company Acquisition Loan" from Bankers Trust to Sun Carriers. Even more telling is the fact that,

under this agreement, no principal payments by the subsidiaries were due in 1989 and 1990, but were due in 1987, 1988 and 1991. Exhibit 8, Amended and Restated Credit Agreement, page 30.

It is unclear to us how or even whether this suspension in principal obligations relates to the suspension of the management fees during the comparable time period. The documents we have before us simply do not show who bore the ultimate responsibility for certain interest payments or how they were calculated in the various loan agreements.

setts has determined that the apportionment percentage should have been 1.42%, rather than 33.82%. Exhibit 14, Audit Log, page 59. Massachusetts seeks a lower apportionment percentage because it would like Sun Carriers' "income" to be attributed away from Massachusetts. This is because, in 1989, Sun Carriers experienced a substantial loss. Debtor's Objection, pp. 18–19. Consequently, the new apportionment percentage would alter Debtor's tax liability because it would reduce Debtor's ability to offset its regular Massachusetts income with the loss of its parent, Sun Carriers.

Massachusetts found three major flaws with Sun Carriers' calculation of the apportionment percentage. Most important, Massachusetts determined that the $3,176,854 in management fees that Sun Carriers received from all of its subsidiaries for non-interest expenses, or the "consideration" for services component, should be included in the sales factor of the equation. It claims that Sun Carriers made an intercompany sale of management services to its subsidiaries and earned the management fee as a receipt. Exhibit 4, Audit Narrative, page 3, ¶ 3 and page 5. Massachusetts also placed the $3,176,854 solely in the denominator as "sales everywhere." No part of the management fee was attributed to Massachusetts because it believes that the management services ceased when Sun Carriers moved to Massachusetts. *Id.* By placing this large figure in the sales factor denominator without any corresponding figure in the numerator, Massachusetts drastically decreased the sales factor and hence the overall apportionment percentage.

The second flaw in the apportionment percentage, according to Massachusetts, is the addition of $26,690 (purportedly half of its overall rentals) to the numerator of the sales factor for "rentals" in Massachusetts. Debtor states that Sun Carriers had divided their total rentals in half to come up with the Massachusetts rentals figure because it spent half of the fiscal year in Massachusetts. Debtor's Objection, page 22. Massachusetts

believes that Sun Carriers was not in the business of renting any property to Debtor after its move to Massachusetts, so there should be no rental income in the numerator. Exhibit 4, Audit Narrative, page 3. Finally, Massachusetts disputed Sun Carriers' "other sales" component of the sales factor. Sun Carriers listed $72,945 as "other sales everywhere" and $55,512 as "other sales Massachusetts." Debtor's Objection, page 22. Massachusetts disallowed any account of "miscellaneous income" in either the numerator or the denominator of the sales factor because the miscellaneous income could not be documented as a sale by Debtor. Exhibit 4, Audit Narrative, page 3. Massachusetts also eradicated any remainder of the numerator, relying on its belief that Sun Carriers ceased to operate after its move to Massachusetts. *Id.* The sales factor ultimately allowed by Massachusetts had a numerator of zero and a denominator of $3,252,237.[4] Exhibit 14, Audit Log, pp. 59 and 64. The audit figure for the sales factor, then, was determined to be zero, a far cry from Sun Carriers' figure on its amended return of 64.8%. Consequently, the final apportionment percentage was determined to be 1.42% rather than Sun Carriers' 33.82%.

The end result of Massachusetts' March 1993 audit was a claimed tax deficiency against Debtor of $795,395.87. Exhibit 2, June 20, 1993 Notice of Intention to Assess. Massachusetts sent a Notice of Assessment, dated August 3, 1993, to Debtor for the amount of $789,318.20. Exhibit 3, August 3, 1993 Notice of Assessment. Massachusetts has claimed the former amount in its amended proof of claim as the correct deficiency figure.

Debtor filed for Chapter 11 relief on June 15, 1993, after the audit date but before the Notice of Intention to Assess. Massachusetts believes that its tax claim falls under 11 U.S.C. § 507(a)(7)(A)(iii) as a tax which was not assessed before the petition date but assessable after the commencement of the case by agreement. In support, Massachu-

---

**4.** This figure represents the $3,176,854 non-interest portion of the management fee, the $53,906 for rentals everywhere (somehow, neither party disputes that $26,690 is half of $53,906) and $21,477 for other sales everywhere (total sales minus miscellaneous income and other disallowances not explained by Massachusetts).

setts has submitted various letters submitted to Debtor in March and April of 1993 alerting Debtor about the audit findings, explaining the changes and requesting further documentation from Debtor. They have also submitted several forms entitled "Consent Extending the Time for Assessment of Taxes," two of which extended the assessment date for taxable years 1987 through 1990 to June 30, 1993 and again to March 31, 1994. These last two forms were signed by Robert Anderson, Debtor's senior tax accountant at the time.

Massachusetts timely filed proofs of claim and amended proofs of claim in Debtor's Chapter 11 proceedings. Debtor objected to the claims, arguing that its records showed that no taxes were due. Before and during the hearing on the claims objection, Massachusetts requested an adjournment because it was unable to locate the documents which presumably supported its claim. We denied Massachusetts' request to adjourn and disallowed its claims. We advised counsel for Massachusetts to file a motion for reconsideration if the supporting documents were found. Based on Massachusetts' documents now before us and Debtor's opposition papers, we hereby grant Massachusetts' motion to reconsider. Massachusetts' claim will be allowed virtually in its entirety in accordance with the discussion that follows.

## DISCUSSION

■ Federal Rule of Bankruptcy Procedure Rule 3001(f) commands that a properly filed proof of claim constitutes prima facie evidence of the claim's validity and amount. Fed.R.Bkrtcy.P. 3001(f). Unless a claim is challenged, it is deemed allowed under 11 U.S.C. § 502(a). Any party objecting to the claim has the burden of putting forth evidence sufficient to negate the prima facie validity of the claim by refuting one or more of the facts in the filed claim. *In re Waterman Steamship Corp.*, 200 B.R. 770 (Bkrtcy. S.D.N.Y.1996). Once this occurs, however, the ultimate burden of persuasion undoubtedly remains upon the claimant. *Id.* The claimant must prove the claim, not sit back while the objector attempts to disprove it. *In re Bennett*, 83 B.R. 248, 252 (Bkrtcy.

S.D.N.Y.1988) (*citing In re Gorgeous Blouse Co., Inc.*, 106 F.Supp. 465 (S.D.N.Y.1952)).

■ In non-bankruptcy tax liability cases, the burden of proof is always on the taxpayer. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). In these instances, taxing authorities enjoy the presumption of administrative regularity. See *Borg–Warner Corp. v. CIR*, 660 F.2d 324, 330 (7th Cir.1981). In the bankruptcy context, however, the courts are split on the issue of whether taxing authorities should be treated like any other creditor and should bear the ultimate burden of proving their claim in bankruptcy or whether they continue to enjoy their elevated civil status within the bankruptcy arena. See *Franchise Tax Board v. MacFarlane*, 83 F.3d 1041, 1044 (9th Cir.1996); *Brown v. Internal Revenue Service*, 82 F.3d 801, 804 (8th Cir.1996); *Placid Oil Co. v. Internal Revenue Service*, 988 F.2d 554, 557 (5th Cir.1993); *Fullmer v. United States*, 962 F.2d 1463, 1466 (10th Cir.1992) (all finding ultimate burden on government), *But cf United States v. Charlton*, 2 F.3d 237 (7th Cir.1993); *Internal Revenue Service v. Levy (In re Landbank Equity Corp.)*, 973 F.2d 265 (4th Cir.1992); *Resyn Corp. v. United States*, 851 F.2d 660 (3rd Cir.1988) and *In re Thinking Machines Corporation*, 203 B.R. 1 (Bkrtcy.D.Mass.1996) (all finding ultimate burden on taxpayer). For reasons explained below, we find it unnecessary to register with either camp.

■ In the motion before us, we are revisiting an objection to claim. Debtor originally objected to Massachusetts' claim by asserting that it was unaware of any tax due because its records did not show any tax due. It was essentially an objection for lack of documentation. Massachusetts has now submitted documentary proof that an audit took place, with consent, and that an official assessment was made and sent to Debtor. Debtor has never requested an abatement from Massachusetts. We find that Massachusetts' proof of claim, with supporting documents, enjoys a strong presumption of administrative regularity and establishes prima facie evidence of its validity. As noted above, it is now the objector's burden to put forth sufficient evidence to rebut this pre-

sumption by refuting one or more of the facts in the filed claim. *In re Waterman Steamship Corp.*, 200 B.R. 770 (Bkrtcy.S.D.N.Y. 1996). Debtor's objection to Massachusetts' motion for reconsideration before us is its first attempt to negate the merits or facts underlying Massachusetts' presumptively valid claim.

Debtor has provided us with voluminous evidence that attempts to refute Massachusetts' assessment. We treat this evidence as support for an objection to claim and will try to ascertain whether any of the legal arguments and supporting exhibits raise any doubts as to the validity of the tax claim. We think this procedure exceptionally fair in light of the fact that the arguments asserted within Debtor's papers should have been raised at the original claims objection hearing because the evidence before us shows that Debtor was or should have been aware of the audit and its results at the time of the hearing. *See In re East Hill Manufacturing Corp.*, No. 94–10626 (Bkrtcy.D.Vt., decided Feb. 11, 1997) (holding that a debtor cannot move to reconsider the allowance of a claim by asserting new evidence when such evidence was in the hands of the Debtor, if not its counsel, at the time of original hearing). We must proceed, however, because even though Massachusetts' assessment is undoubtedly not unlike other assessments regularly prepared within its administration, we cannot rest Debtor's tax liability on a presumption until we assess the merits of Debtor's objection. We then must carry our freight to the next destination—the law of Massachusetts Excise Taxes.

■ First, we will address the interest expense portion of the management fee. Debtor believes that it is entitled to deduct the interest portion of its management fee to Sun Carriers because it was in effect servicing its own debt to Bankers Trust. It argues that not only did it guarantee Sun Carriers' debt to Bankers Trust, but it also eventually began to make payments directly to Bankers Trust in 1990 when Sun Carriers' other subsidiaries were sold. Massachusetts instead found that interest relating to acquisition costs could not be pushed down to the subsidiary who would in effect be paying interest

for someone to acquire them. Massachusetts determined that the amount was really income of Debtor that was then paid to Sun Carriers in the sustenance of a dividend.

■ We find this first issue to be the easiest to resolve. We agree with the position of Massachusetts. Interest expenses are only deductible on one's own "indebtedness." A "debt" is that which is due from one person to another. *Gilman v. Commissioner of Internal Revenue*, 53 F.2d 47, 50 (8th Cir.1931). It is difficult to establish that a parent is merely a conduit for an indebtedness owed to third parties. *See, e.g., In re Toys "R" Us, Inc., v. Taxation Division Director*, 8 N.J. Tax 51, 65 (T.C.N.J.1985); *Stinnes Interoil, Inc. v. Director, Division of Taxation*, 7 N.J. Tax 473, 480 (N.J.T.C.1985); *Rollins Leasing Corp. v. Director, Division of Taxation*, 13 N.J. Tax 359, 370 (T.C.N.J. 1993). In the above cited line of cases, the taxpayers were either (1) parents trying to establish that loans made to subsidiaries were actual loans with deductible interest rather than contributions to subsidiary capital or (2) subsidiaries trying to establish that payments to parents on loans were actually payments to third parties through the parent as conduit, not direct payments to the parents. The subsidiaries in the latter cases were trying to avoid tax laws which in effect include in the subsidiaries' net worth payments to shareholders holding over 10% of the subsidiaries' stock, instead of allowing the subsidiaries to take interest deductions on such payments. *See Rollins, supra*, at 362. The subsidiaries did not succeed on the conduit issue. *See Rollins, supra*, at 367; *Stinnes, supra*, at 480. In both types of cases, the intent of the tax statutes was to pierce complex corporate structures and expose the transactions for what they really were—either loaning yourself money or borrowing money from yourself. Neither transaction, in its broken down form, lends itself well to tax deductibility.

The case before us presents a similar factual scenario and a similar tax question—deductibility—but with different tax laws. We find the reasoning of the above cases persuasive. In this case, the structure of the management fee does not allow the assump-

tion that the subsidiaries were directly responsible to Bankers Trust for Sun Carriers' debt service. Contractually, we have before us a debt issued from parent to third party and a separate fee arrangement from subsidiary to parent. The subsidiaries paid for Sun Carriers' interest expenses according to the portion of the overall shareholders equity that each subsidiary represented. Debtor was paying according to an agreement between itself and Sun Carriers, not on a direct loan from Bankers Trust. Once Debtor was acquired, it neither received a continuing benefit nor bore a continuing burden relating to Sun Carriers' obligation to Bankers Trust.

■■■■ The fact that Debtor guaranteed Sun Carriers' debt to Bankers Trust does not persuade us otherwise. A guarantee is only a potential future liability, becoming an actual liability when payments on the guarantee are made. *In re Toys "R" Us, Inc., supra,* at 65. The focus, with questions of deductibility, is on the actual borrower, the primary obligor, even if the borrower never benefits from a loan. *Stinnes Interoil, Inc., supra,* at 480. As Debtor asserts, Debtor only began paying directly to Bankers Trust when there were no other subsidiaries left in the allocation formula and Sun Carriers had a dubious existence. This detour for simplicity's sake did not change the original obligations of the parties or the heart of the transaction. There was a basic arrangement where Sun Carriers incurred a debt to acquire various subsidiaries and the subsidiaries guaranteed its obligations.

Debtor has cited *In re Colt Industries, Inc. v. New York City Department of Finance,* 66 N.Y.2d 466, 497 N.Y.S.2d 887, 488 N.E.2d 817 (1985) for the proposition that courts should respect a corporation's characterization of a management fee and not break it down into its component parts. We find this to be a strained reading of *Colt,* especially in light of the fact that the contract in this case allows us to easily break down the management fee into its component parts. The Court of Appeals of New York held that a parent's management fee was properly determined by the department to be income of the parent and not "income from subsidiary capital," which is excluded from net income by

New York statute. *Id.* at 471–72, 497 N.Y.S.2d 887, 488 N.E.2d 817. Part of the Court's rationale was that the fee was based on portions of subsidiary sales and did not break out or identify any income generated by the parent's investment in a specific subsidiary. *Id.* We find this case to be inapposite because the Court never addressed the deductibility of the management fee by the subsidiaries. We also note that the Sun Carriers' investment in Debtor here is easily traceable to Debtor's acquisition.

We agree instead with Massachusetts that *In re Servair v. New York State Tax Commission,* 132 A.D.2d 737, 517 N.Y.S.2d 98 (1987) applies. The Court, in *Servair,* held that a subsidiary could not deduct a fiscal expense which represented its apportioned share of interest expense incurred by the parent on borrowed funds. *Id.* at 738, 517 N.Y.S.2d 98. The subsidiary did not prove that it owed any interest-infused debt to the parent. *Id.* Such is the case before us. There is no evidence that the subsidiaries borrowed money from the parent. It is undisputable that the actual loan transaction occurred between Sun Carriers and a third party. Sun Carriers used the funds to acquire Debtor, not to lend it money. Debtor and Sun Carriers had a separate contractual fee arrangement. Hence, the interest expense is not deductible by Debtor.

Debtor's final argument with respect to the interest expense is that the payment of Sun Carriers' debt service, beginning in 1990, entitles it to a worthless business debt deduction. Debtor argues that it fits under 26 CFR § 1.166–9 because it began paying Bankers Trust to discharge its obligation as a guarantor. We are unable to determine whether the interest expense payments could be considered worthless business debts because Debtor has provided us with no evidence of payments being made directly to Bankers Trust to discharge its obligation as guarantor. We also point out that Massachusetts is concerned with fiscal year ending March 1989 and fiscal year ending March 1990, while Debtor is referring to direct payments being made to Bankers Trust at some point in 1990, of which we have no evidence. The evidence before us shows only that

Debtor continued its management fee obligation to pay its share of Sun Carriers' interest expenses.

We hold, then, that the interest expense portion of the management fee is not deductible by Debtor. Massachusetts properly reclassified those "expenses" paid by Debtor as "dividends" paid to its parents and increased its income accordingly.

We now turn to the calculation of Sun Carriers' apportionment percentage. Massachusetts first found that the entire non-interest portion of the management fees Sun Carriers received, the "compensation for services" component, should be added to the denominator of the sales factor as intercompany sales outside of Massachusetts. Section 38(f) of Massachusetts General Corporate Excise Laws (Chapter 63) defines "sales" as "all gross receipts of the corporation except interest, dividends, and gross receipts from the maturity, redemption, sale, exchange or other disposition of personal property." Sales of other than tangible property are said to occur within Massachusetts if either the income producing activity is performed in Massachusetts or if a greater proportion of the income producing activity is performed in Massachusetts than in any other state based on cost of performance. 63 M.G.L. § 38. When a taxpayer participates in a consolidated return for federal income tax purposes, sales include gross receipts from intercompany sales. 830 CMR 63.38.1(9)(b)8. If payments from a subsidiary to a parent are in substance dividends, they are not included in the sales factor. *Id.* This subsection also notes that the value of the gross receipts in these intercompany transactions is the arms length fair market value of the property or services. The final section we need to aid in our understanding of the "sales factor" is 830 CMR 63.38.1(9)(b)3 which reads: "Providing Services. Sales include gross receipts from the performance of services including commissions, fees, management charges, and similar items. (See 830 CMR 63.38.1(9)(b) [cited above] regarding proper amount of service fees in intercompany transactions.)".

■ Applied to our situation, the above sections tell us that the management fees paid by Debtor to Sun Carriers are sales by Sun Carriers if they are indeed payments for actual services, representing the fair market value of such services, and are not in substance dividends. They will be allocated to Massachusetts if the income producing activity, the management services being paid for, occurred mostly in Massachusetts.

■ None of the statutory sections cited specifically address expense reimbursements. A reimbursement could be a disguised sale and vice versa. We need to turn to case law to determine the test for deciphering the expense reimbursements in these contexts. Generally, gross receipts constitute money that a corporation receives for proceeding with its ordinary business activities. See Comptroller of Public Accounts, State of Texas, Hearing No. 12,857, 1985 WL 16109 (Tex.Cptr.Pub.Acct.). A corporation may take an expense deduction when it expends ordinary and necessary amounts of money to create gross receipts, or to maintain and operate itself. See 71 AmJur2d, State and Local Taxation § 520. If a corporation charges another entity for expenses which it would normally bear in the course of its ordinary business activity, the charges result in a gross receipt. Comptroller of Public Accounts, supra at *3. It is a benefit or profit bestowed upon the corporation.

■ These general principles translate into the parent and subsidiary context as follows. If a parent pays for a specific business expense of a subsidiary and gets reimbursed for it, it is considered a wash. The reimbursement will exactly negate the expense if the specific expense can be traced. On the other hand, if a parent charges down general overhead expenses, being reimbursed for what would normally be its own expenses, it receives a gross receipt. Comptroller of Public Accounts, State of Texas, Hearing No. 12,857, 1985 WL 16109, *2 (Tex. Cptr.Pub.Acct.); *Novar Electric Corp. v. Limbach, Tax Commissioner of Ohio,* 1989 WL 132775, *3 (Ohio Bd.Tax.App.); Department of Taxation and Finance, State Tax Commission, State of New York, hearing No.

TSB–A–86 (21) C, 1986 WL 31386 (N.Y.Dept. Tax.Fin.). The Texas case above involved a more comprehensive code section that specified that all intercorporate sales and service charges are considered gross receipts even if all sales and service activities are centralized and other corporate offices reimburse the central office based on actual cost. Comptroller of Public Accounts, *supra*, 1985 WL 16109 at *2 (citing 34 TEX.ADMIN.CODE § 3.403(17)). The Texas code section eliminated the hassle of separating certain types of expenses from others in these contexts, recognizing how often parents do earn money from such fee arrangements. This is especially true when a parent's primary business consists of holding subsidiaries and collecting fees from them. *Novar, supra*, 1989 WL 132775 at *3; Dept. of Taxation and Finance, *supra*, 1986 WL 31386 at *2. The fees are compensation for its ordinary business activity.

■ In this case, Debtor has not identified any specific expenses which were passed through the parent without profit to the parent. There were no specific services by outside professionals or utility bills, for example, that Debtor could prove were specifically incurred by Sun Carriers for Debtor. In fact, the agreement made between Debtor and Sun Carriers specifically identifies the expense reimbursements as compensation for services. See Agreement, Exhibit 11, page 3–4. The parties contracted that the value of these services approximates the amount that Sun Carriers purports to spend on Debtor's behalf. The agreement also refers to Sun Carriers' expertise in management, financing and marketing, leading us to the inescapable conclusion that any "compensation" payments received by Sun Carriers were receipts of its ordinary business activity, i.e. managing and holding subsidiaries. See Agreement, Exhibit 11, page 1. Thus, we find the entire, non-interest portion of the management fee to be the agreed upon value of services that Sun Carriers provided for Debtor. They are indeed sales.

■ Debtor has not rebutted the presumption that the recalculation of the sales factor by Massachusetts was legitimately calculated. We also do not find any merit in

Debtor's argument that half of the purported "sales" should be added to the sales factor numerator because the "greater proportion of the services were rendered in Massachusetts." Debtor's Objection, page 21, citing Mass.Regs.Code tit. 830 § 63.38.1(9)(d)(3)(a) (1996). Despite the arguments made before us today, we find Debtor's original statement, found in its 1989 Consolidated Financial Statements, to be the most persuasive. These statements, certified by Coopers and Lybrand to fairly represent "the consolidated financial position of St. Johnsbury Trucking Company, Inc.," explain that all management charges ceased when Sun Carriers closed its Pennsylvania headquarters and moved to Massachusetts to consolidate with Debtor and reduce expenses. Exhibit 23, 1989 Consolidated Financial Statements, page 8. Any purported reinstatement of the management fee in 1991 does not concern us because Massachusetts only made adjustments for management fees charged before March 1989. Therefore, the sales factor numerator was correctly calculated by Massachusetts to be zero.

Debtor finally argues that Massachusetts improperly recalculated certain amounts of rental income and "other sales" in its sales factor. Debtor first asserts that one-half of its $53,906 in rental income should be allocated to Massachusetts. Debtor's Objection, page 22. It offers as proof the 1989 Consolidated Federal return which lists Sun Carriers' total rental income as $53,906 and that one half of the year was spent in Massachusetts. See Debtor's Objection, page 22, citing Exhibit 26, 1989 Consolidated Federal Return, page 5. Once again, we find no merit in Debtor's argument because the 1989 Consolidated Financial Statements describe Sun Carriers' move as a cessation and consolidation. Debtor has provided us with no direct evidence of Sun Carriers' continued operations in Massachusetts.

■ Debtor also objects to Massachusetts' treatment of its $72,495 in "other sales." We initially hold that Massachusetts' eradication of the numerator was valid for the reasons explained above. We also agree that the "miscellaneous income" of $41,945 has not been documented. Although the

number does exist in the Consolidated Federal Return, we have not been provided with any documentation. The 1989 Statement 111 by Sun Carriers, on the other hand, does document approximately $30,000 of "other sales" made by Sun Carriers. The denominator allowed by Massachusetts has an "other sales" denominator of approximately $21,000 rather than $31,000. This $10,000 discrepancy has not been explained by Massachusetts. We question its validity and therefore must disallow it. The addition or subtraction of $10,000 from a sales factor denominator of over $3 million, however, is *de minimus*.

## CONCLUSION

We find Massachusetts' assessed deficiency to be valid in its approximate entirety. Debtor has not refuted any of the material facts of Massachusetts' claim. As a final note, Debtor has asserted that if we were to reach the above conclusion, we should subtract approximately $63,000 from the final allowance for unconstitutional "decal taxes" charged by Massachusetts and paid by Debtor pre-petition. Debtor has submitted tax receipts and case law. See Exhibit 5. Debtor has brought forth evidence to which Massachusetts must respond.

We therefore will allow Massachusetts' claim, as recalculated after subtracting approximately $10,000 from the sales factor denominator, subject to a $63,000 holdback.

Counsel for Massachusetts is to settle an order on Debtor and submit it within 10 days.